**UNITED STATES of America**
**v.**
**Clayborne JAMISON, Jr., Appellant.**

**UNITED STATES of America**
**v.**
**Clayborne JAMISON, Sr., Appellant.**
**Nos. 73-1277 and 74-1042.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 28, 1974.

Decided Oct. 15, 1974.

Daniel M. Singer, Washington, D. C. (appointed by this court) for appellant in No. 73–1277.

Thomas Fortune Fay, Chevy Chase, Md., for appellant in No. 74–1042.

James N. Owens, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Warren L. Miller, Asst. U. S. Attys., were on the brief, for appellee. Harold H. Titus, Jr., U. S. Atty., at the time the record was filed, entered an appearance for appellee in No. 73–1277.

Before McGOWAN and ROBINSON, Circuit Judges, and WEIGEL,* United States District Judge for the Northern District of California.

McGOWAN, Circuit Judge:

The central question presented by these consolidated appeals from the District Court is whether appellants, having successfully sought a mistrial under an earlier indictment for second degree murder, could thereafter be indicted for first degree murder. We conclude that, under the circumstances disclosed by this record, the Due Process Clause stands in the way. Accordingly, and for the reasons set forth hereinafter, we find the indictments invalid and reverse the convictions.

## I

According to the testimony of government witnesses, appellants Clayborne Jamison, Sr., and his son, Clayborne Jamison, Jr., spent much of the evening of April 13, 1971, searching for one Paul Willis, whom they accused of having robbed them on two occasions. Two witnesses, one of them Willis's mother, testified that the Jamisons had approached them during the evening to ask if they knew Willis's whereabouts, and, brandishing pistols, had stated their intention when they found him to "blow his brains out." Several bystanders in the cafe where Willis was murdered later that night testified that it was Jamison, Jr., accompanied by his father, who entered the cafe and, walking straight to where Willis was seated, put a pistol to his head and fired the shot which caused his death.

---

* Sitting by designation pursuant to Title 28 U.S. Code Section 292(d).

Indicted for second degree murder and carrying a dangerous weapon, 22 D.C. Code §§ 2403, 3204 (1973), appellants were tried together on June 1, 1972. In the presentation of the government's evidence, the prosecutor attempted to introduce an oral confession purportedly made by Jamison, Jr., when he surrendered himself to police custody a few hours after the shooting, but this was found by the trial judge to have been illegally obtained and it was excluded. Defense counsel, who was representing both appellants, thereafter made an opening statement to the jury which consisted almost exclusively of an assertion that both appellants would take the stand in their own defense and that their testimony would prove more credible than that of the government's witnesses. The trial judge immediately called defense counsel to the bench and directed his attention to the Supreme Court's decision in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), under which the government would in all likelihood have been permitted to introduce the excluded confession to impeach Jamison, Jr., had he taken the stand. There was a short recess during which defense counsel acquainted himself with the *Harris* case, of which he confessed he had previously been unaware. During this recess, the prosecutor apparently notified defense counsel that he also intended to offer the testimony of Jamison, Sr.'s wife should the Jamisons take the stand. [1]

Following the recess there was a further discussion at the bench, during which the trial judge commented that if appellants did *not* take the stand, defense counsel would have to make some explanatory statement to the jury, which might draw adverse inferences from the reversal of strategy. Defense counsel then requested "ten or fifteen minutes" for discussion of the dilemma with his clients. Expressing dissatisfaction with the delay that had already been caused, the trial judge gave defense counsel "five or six minutes" for the purpose. When the court reconvened, defense counsel moved for a mistrial on grounds of "ineffective assistance of counsel." The prosecutor responded that he was "ready to go to the jury" and "in a real good position," suggesting also that each defendant be asked if he concurred in defense counsel's motion. Without elaboration the trial judge asked each appellant if he "agreed with the position taken" by defense counsel. When they answered affirmatively, a mistrial was declared.

Appellants were subsequently re-indicted for *first* degree murder and carrying a dangerous weapon, 22 D.C. Code §§ 2401, 3204 (1973), to which they took exception. [2] At their second trial beginning October 18, 1972, the government offered substantially the same evidence as it had offered at the first trial. Appellants offered no evidence of their own, and after the dismissal of the dangerous weapon count

1. It is unclear from the record whether the prosecutor intended to call Mrs. Jamison herself or to offer an out-of-court statement made by her concerning her husband's and stepson's involvement in the crime. Tr. 25–27. Apparently, he intended to offer the testimony only by way of impeachment of the Jamisons' testimony, though the record also fails to make clear whether he limited its potential use in this way purely as a matter of tactics or because he thought it likely to be admissible only as impeachment evidence.

2. Appellants' joint motion to dismiss the indictment for first degree murder was made at the opening of their trial, two days after they had entered pleas of not guilty. Fed. R.Crim.P. 12 requires, on pain of waiver, that a motion challenging the indictment be made "before the plea is entered." It also provides, however, that "the court may permit it to be made within a reasonable time thereafter," and though there is some suggestion that the trial judge in this case did not consider appellants' motion "timely," Tr. 4–7, we do not consider ourselves barred by such a minor delay from considering such a fundamental flaw in the indictment as is asserted here.

against Jamison, Sr., a jury convicted them as charged. They now appeal their convictions for first degree murder.[3]

Appellants have between them raised a number of distinct challenges to their convictions: (1) that the earlier trial ending in a mistrial constituted former jeopardy and barred any reprosecution of them for the criminal acts involved in this case; (2) that the double jeopardy clause in any event prevented the United States from reindicting them for a more serious crime than that for which they were previously indicted; (3) that the possibility of being charged with and convicted of a more serious crime on retrial denied the defendants due process in that it placed an "unconstitutional condition" on the exercise of their right to seek a mistrial; (4) that due process requires that the fear of a vindictive charge increase following upon a successful defense request for a mistrial be dispelled by a prohibition of any such increase;[4] and (5) that, in the case of appellant Jamison, Jr., who was twenty years old when sentenced, the trial court erroneously sentenced him as an adult instead of committing him as a youth offender under the Youth Corrections Act, 18 U.S.C. § 5005 et seq. (1970). We think the first of these contentions

is without merit; and, since we hold that the fourth requires reversal, we do not reach the remaining points.[5]

## II

In considering the various ways in which a trial may come to an end prematurely, the courts have largely "declined . . . to formulate rules based on categories of circumstances which will permit or preclude retrial." United States v. Jorn, 400 U.S. 470, 480, 91 S.Ct. 547, 555, 27 L.Ed.2d 543 (1971). In appellants' case, however, their mistrial falls into that category which has most consistently been held not to bar further proceedings, namely, those mistrials which are granted at the behest of defendants. The Supreme Court has repeatedly held that the Double Jeopardy Clause does not bar reprosecution of a defendant who succeeds in overturning his conviction on appeal. North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919); United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); and it has left little doubt that the same is true of a defendant who succeeds in obtaining a mistrial. United States v. Jorn, *supra*, 400 U.S. at 485, 91 S.Ct. 547; Unit-

3. Appellant Jamison, Jr., has raised no objection to his conviction for carrying a dangerous weapon, and we see none. Accordingly, that conviction stands.

4. A claim based specifically on the danger of vindictiveness is suggested by the discussion in the elder Jamison's brief at 47–59. However, it is not clearly distinguished therein from a claim (number (3) in our enumeration) based on the possibility of a charge increase without regard to motivation. Br. appellant Jamison, Sr., at 47–59. We regard the two theories as distinct for the reason that the "unconstitutional conditions" theory seemingly applies regardless of the reason for the increase in charged offense and thus implies a complete ban on such increases, which, as our opinion demonstrates, the vindictiveness theory does not. It should also be noted that neither appellant's brief did, nor could, draw support from Blackledge v. Perry, 417 U.S. 21, 94 S.Ct. 2098, 40 L. Ed.2d 628 (1974), upon which we base our

result in this opinion. The briefs in this appeal were filed prior to May 20, 1974, when *Blackledge* was decided. Pursuant to our request at oral argument, however, supplemental memoranda have been filed on the question of *Blackledge's* significance for this appeal.

5. Jamison, Jr's, objections to adult sentencing are, of course, not mooted simply by our reversal of his first degree murder conviction; presumably he also appeals the adult sentence he received because of his unchallenged conviction of the deadly weapon charge. However, the one-year sentence which he received for carrying a deadly weapon has now been fully served, having run concurrently with his life sentence for murder. No relief would be available, therefore, even assuming that the sentence was improper. *Cf.* Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).

ed States v. Tateo, 377 U.S. 463, 467–468, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1961). The rule that a mistrial on defendant's motion generally does not bar retrial is firmly established in this circuit, *see* United States v. Henderson, 142 U.S.App.D.C. 21, 439 F.2d 53 (1970); Gregory v. United States, 33 U.S.App. D.C. 317, 410 F.2d 1016 (1969); Leigh v. United States, 117 U.S.App.D.C. 315, 329 F.2d 883 (1964), as well as in a number of others. *See* United States v. Romano, 482 F.2d 1183 (5th Cir. 1973); United States v. Goldstein, 479 F.2d 1061 (2d Cir. 1973); Roberts v. United States, 477 F.2d 544 (8th Cir. 1973) (per curiam); United States v. Pappas, 445 F.2d 1194 (3d Cir.), cert. denied sub nom., Mischlich v. United States, 404 U. S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971); United States v. Franke, 409 F.2d 958 (7th Cir. 1969); Raslich v. Bannan, 273 F.2d 420 (6th Cir. 1959).

▆ Appellants argue, however, that the formality of the defendant's having moved for a mistrial should not be controlling in all cases, and that to consider it so would be to adopt a "mechanical rule" of the kind that the Supreme Court has consistently rejected in this area. Illinois v. Sommerville, 410 U.S. 458, 462, 467, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). To be sure, a judge or prosecutor should not be free to have one trial disbanded and another convened by intentionally committing errors so prejudicial to the defendant that he is forced to seek a mistrial; and, indeed, the Supreme Court has made it clear that in such a case of "judicial or prosecutorial overreaching," reprosecution might well be barred. United States v. Jorn, *supra,* 400 U.S. at 485 & n. 12, 91 S.Ct. 547. *See also,* United States v. Tateo, *supra,* 377 U.S. at 468 n. 3, 84 S.Ct. 1587.

When exactly judicial or prosecutorial misconduct ceases to be of the kind that may provoke a defendant's mistrial motion without barring retrial and becomes an "overreaching" we cannot say, but no such question arises in this case. It was action by defense counsel which brought about the need to discontinue the proceedings. It may be that he would not have moved for a mistrial had not the prosecutor threatened to introduce the excluded confession and the testimony of Jamison, Sr.'s wife if appellants took the stand, but we can find no fault with the prosecutor's making it clear that he would use whatever evidence was legally available to the government. As for the trial judge, apart from acceding to the mistrial motion, his actions were primarily confined to advising defense counsel for his own benefit of the difficulties to which he had exposed his clients in light of the *Harris* case. Nor do we find that defense counsel was in any way pressured into moving for a mistrial.[6] The judge had not mentioned the possibility of a mistrial before defense counsel moved for one.[7]

6. United States v. Walden, 448 F.2d 925 (4th Cir. 1971), upon which appellants heavily rely, is distinguishable in this respect. There the Double Jeopardy Clause was held to bar retrial after a mistrial on defendant's own motion, but on a finding that the judge at the first trial had *invited* the mistrial motion and left the impression that he "might have acted *sua sponte* had there been no response to his invitation." 448 F.2d at 929. Nor was the precipitating error in that case, allowing the jurors to see the defendants in handcuffs during a court recess, in any way attributable to the defendants themselves. We note also that this decision by a panel of the Fourth Circuit was reheard and reversed by the court *en banc,* 458 F.2d 36 (4th Cir.) cert. denied, Ard v. United States, 409 U.S. 867, 93 S.Ct. 165, 34 L.Ed.2d 116 (1972), though the reason for the reversal may have been a reluctance to apply the "overreaching" dictum of *Jorn* retroactively. *See* 448 F.2d at 928.

7. It is argued that the trial judge in effect forced defendants to move for a mistrial by limiting them to "five or six minutes" to discuss the alternatives. Apart from the fact that the trial judge's impatience seems entirely justified, a recess having just been taken to allow defense counsel to study the question, there is no suggestion that the trial judge expected a decision within five minutes on whether to make a mistrial motion, which possibility had not been discussed. It appears from the record, rather,

The prosecutor's only response to the motion was that he was "ready to go to the jury right now" and "in a real good position," a reasonable construction of these remarks being that he *opposed* a mistrial.[8]

■ Appellants argue, however, that their motion for a mistrial should be judged for its effectiveness in preventing a double jeopardy claim as if it were a "waiver" of their constitutional right to have their guilt or innocence determined at the first trial. They contend that under Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and subsequent cases, the "waiver" was ineffective.[9] But we think appellants misconceive the significance of the fact that they themselves, through counsel, requested the mistrial. This fact is not

their principal obstacle under the Double Jeopardy Clause because it constitutes a "waiver" in the sense that word is used in *Zerbst,* but because the policy of the Double Joepardy Clause, weighed as it always must be against the interest of the state in pursuing criminal prosecutions to their conclusions, is simply not thought to require that a defendant be free of further prosecutions when it was he, and not the judge or prosecutor, who sought to have the original prosecution discontinued. When this is true, and there is no evidence of "judicial or prosecutorial overreaching," the central policy of the Double Jeopardy Clause—to protect defendants from *government*-instigated multiple prosecutions and sentences—is not implicated. *See* Green v. United States, 355 U.S. 184, 187–188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

that defendants were simply being asked to decide whether to continue with their defense as counsel had just outlined it. It may well be that if counsel had asked for more time to discuss a mistrial motion with his clients, it would have been granted.

8. Appellants offer several possible prosecutorial motives for provoking a mistrial and ask us to infer from these a "preconceived plan" to do so. We would be extremely reluctant to draw such an inference wit'.out more direct evidence even if we were persuaded that a strong motive existed to seek a mistrial, and in this case we are not so persuaded. Appellants speculate that the prosecutor wished to increase the indictment and believed that he could do so after a mistrial but not after a conviction; but we doubt that the prosecutor could have been so sure that the outcome of this appeal (prohibiting such an increase after mistrial) would be other than it is. As for the suggestion that the prosecutor wished to strengthen his case and bring it a second time, he stated that he thought himself "in a real good position" at the first trial, and in fact the government did not substantially alter or improve its case when it was brought again four months later. In any event it is hardly the normal prosecutor's wish after completing the presentation of a patently convincing case to start over in the hope of making some improvement. Appellants also suggest that the prosecutor wished to avert a conviction which he expected would be reversed because of the conflict of interest present in defense counsel's representation of both defendants. Even if we assumed

that the possibility of such a reversal was foreseen, we do not suppose that a prosecutor ordinarily begins to yearn for a mistrial at the first sign of possibly reversible error.

9. Johnson v. Zerbst, *supra,* which involved an alleged waiver of the right to counsel, defined a valid waiver as "an intentional relinquishment or abandonment of a known right or privilege." 304 U.S. at 464, 58 S.Ct. at 1023. This formulation has been applied in the context of a number of other constitutional rights of criminal defendants. *See, e. g.,* Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966) (waiver of privilege against self-incrimination) ; Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942) (waiver of right to jury trial) ; Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L. Ed.2d 274 (1969) (waiver of right not to plead guilty) ; United States ex rel. Negron v. New York, 434 F.2d 386, 390 (2d Cir. 1970) (waiver of non-English-speaking defendant's right to translator at trial) ; United States v. McPherson, 421 F.2d 1127 (1969) (waiver of right to be present at trial) ; Reeves v. Warden, 346 F.2d 915 (4th Cir. 1965) (waiver of right to exclude illegally obtained evidence). *See also* Fay v. Noia, 372 U.S. 391 (1963) (waiver of right to assert federal claims in state court). Appellants' theory is that their constitutional right to complete their first trial could not have been validly waived because they did not know it existed, and certainly did not know that if they did seek a mistrial they could be reindicted for a more serious offense.

To treat mistrial motions as waivers of double jeopardy protection would be to require among other things that it be established that the defendant himself concurred in such motions, fully comprehending all his alternatives. *See* Cross v. United States, 117 U.S.App.D.C. 56, 325 F.2d 629 (1963) (defendant must be advised by court of right to be present at trial before he could validly waive that right). Defendant would thus be protected from multiple prosecutions brought about not by the government but by the errors or misjudgments of his own counsel. We think this goes too far, and hence we decline to decide the double jeopardy effect of mistrials by reference to the rules of waiver. We prefer the approach of Justice Harlan, who observed in defense of the principle that a successful criminal appellant may be retried, " . . . of greater importance than the conceptual abstractions employed to explain the . . . principle are the implications of that principle for the sound administration of justice." United States v. Tateo, 377 U.S. 463, 466, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448 (1964). The startling implication of barring reprosecution after a mistrial brought about by defense counsel's own errors and on his own motion is that the government could irrevocably lose the right to prosecute for a given crime without itself having committed the least impropriety, and with the trial judge having erred only in declining to second guess defense counsel as to the accused's best interests.

### III

Although free to reprosecute appellants after their first trial was aborted, the government was not necessarily free to reindict them for a more serious crime than had been originally charged. On the contrary, we have concluded that, under the line of Supreme Court cases which began in 1969 with North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072 (1969), the reindictment of defendants for first degree murder, absent any showing of justification for the increase in the degree of the crime initially charged, denied them due process of law.

In *Pearce* the court considered the question of whether a defendant who successfully attacks his conviction but is later retried and reconvicted may constitutionally receive a more severe sentence at his second trial than at his first. The Court rejected two theories by which such sentence increases would have been absolutely prohibited: (1) that successful appellants were thereby subjected to double jeopardy and (2) that the practice denied them the equal protection of the laws. Instead the Court based its decision on the possibility that a defendant might be the victim of "vindictiveness . . . for having successfully attacked his first conviction." Due process was held to require that such vindictiveness play no part in the reconviction sentence, and was further held to require "that a defendant be freed of apprehension of such retaliatory motivation on the part of the sentencing judge." The Court continued:

In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

395 U.S. at 725–726, 89 S.Ct. at 2081.

The Court has subsequently made clear that the question of whether in a particular situation due process requires such explicit justification for reconviction sentence increases turns on the likelihood that vindictiveness would otherwise play a part and that potential appellants would otherwise fear that it would. On facts which were similar to

**414**

those of *Pearce,* the Court in Moon v. Maryland, 398 U.S. 319, 90 S.Ct. 1730, 26 L.Ed.2d 262 (1970), dismissed a certiorari petition partly on the ground that appellant's counsel stipulated that the resentencing judge was not motivated by vindictiveness. *Id.* at 320–321, 92 S.Ct. at 1730–1731. *But see* United States v. Gambert, 433 F.2d 321 (4th Cir. 1970) (*Moon* explained as merely declining to apply *Pearce* retroactively). In Colten v. Kentucky, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), the "prophylactic rule of *Pearce* was rejected because it was thought that the possibility of vindictiveness did not "inhere" in a two-tier system where a trial *de novo* in a different and higher court could be had by defendant without the assertion of any error. *Id.* at 116–117, 92 S.Ct. at 1960. During its 1972 term the Court again declined to apply *Pearce,* this time to reconviction sentences meted out by juries, the likelihood that a jury would impose a sentence increase out of vindictiveness being considered "*de minimis.*" Chaffin v. Stynchcombe, 412 U.S. 17, 26, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973).[10]

For a time it was uncertain whether due process required that criminal defendants be shielded as well from the danger of prosecutorial vindictiveness, and specifically from increases in the offense charged. *Chaffin* suggested that prosecutorial vindictiveness was not to be feared, at least insofar as it might bring about an increased sentence through increased sentence recommendation. *See* Chaffin v. Stynchcombe, *supra,* at 27 n. 13, 93 S.Ct. 1977. How-

ever, lower courts have generally assumed in the wake of *Pearce* that it did apply to increases in the charged offense, Sefcheck v. Brewer, 301 F.Supp. 793 (S.D.Iowa 1969) (*Pearce* prohibits charge increase after withdrawal of guilty plea), though it has on occasion been found either that there was no effective increase in the charged offense, United States v. Farinas, 308 F.Supp. 459 (S.D.N.Y.1969) (no prejudice from division of one count indictment into five counts), or that in particular circumstances the likelihood that such an increase would be motivated by vindictiveness was not sufficient to justify restrictions of the kind imposed by *Pearce.* United States ex rel. Williams ·v. McMann, 436 F.2d 103 (2d Cir. 1970), cert. denied, 402 U.S. 914, 91 S.Ct. 1396, 28 L.Ed.2d 656 (1971) (restoration of original charge after withdrawal of bargained guilty plea "scarcely suggestive of vindictiveness").[11]

█ We think the Supreme Court has now settled the question in Blackledge v. Perry, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), a case involving a two-tier system of criminal trials similar to that considered in Colten v. Kentucky, *supra.* Defendant Perry was originally charged with the misdemeanor of assault with a deadly weapon and brought to trial in a North Carolina inferior court. Following his conviction he asserted his statutory right to a trial *de novo* in a higher court, where he was charged with and convicted of the felony of assault with a deadly weapon with intent to kill and inflict serious bodily injury. The net result was an increase of

---

10. Though we have not found it necessary in this opinion to reach the challenges which appellants make to their charge increases on the basis of double jeopardy and the concept of "unconstitutional conditions," we note that appellants in *Chaffin* made substantially identical challenges to their sentence increases and that these challenges were rejected by the Supreme Court. Chaffin v. Stynchcombe, *supra* at 23–24, 29–35, 93 S. Ct. 1977.

11. Several courts have simply passed over incidents of possible prosecutorial vindictive-

ness without discussion of *Pearce's* applicability to the prosecutor. *See* Taylor v. United States, 475 F.2d 1121 (6th Cir. 1973); Percy v. South Dakota, 443 F.2d 1232 (8th Cir.), cert. denied, 404 U.S. 886, 92 S.Ct. 223, 30 L.Ed.2d 169 (1971). On the other hand, the Fifth Circuit held even prior to *Pearce* that to bring an increase charge in retaliation for a defendant's seeking federal habeas relief placed an "impermissible burden" on the exercise of that right. Colon v. Hendry, 408 F.2d 864 (5th Cir. 1969).

eleven months in Perry's sentence. Because it found a "realistic likelihood of 'vindictiveness' " on the part of the prosecutor, the Court concluded that it was "not constitutionally permissible for the State to respond to Perry's invocation of his statutory right to appeal by bringing a more serious charge against him at the trial *de novo*." 417 U.S. at 28–29, 94 S.Ct. at 2103. We think that *Pearce* has thus been made fully applicable to the prosecutor as well as the sentencing authority, and, since we see no persuasive distinction between *Blackledge* and the case before us, we think that a reversal is required.

The government attempts several distinctions of *Blackledge*. The first is that the increase in charge in that case was from a misdemeanor to a felony and carried a possible sentence increase of eight years,[12] whereas the increase in charge in the case before us was from second to first degree murder, both of which crimes are felonies and both of which carry a maximum potential sentence of life imprisonment.[13] Because of this difference, it is argued, a "realistic likelihood of vindictiveness" was present only in *Blackledge*. However, the Supreme Court in *Blackledge* in no way relied on the fact that the increase in charge in that case was from a misdemeanor to a felony. It referred to the "more serious collateral consequences" of a felony conviction only by way of suggesting that its result in the case would have been the same had there been no possibility of more lengthy incarceration but *only* an increase from misdemeanor to felony. 417 U.S. at 28 n. 6, 94 S.Ct. at 2103 n. 6. Moreover, we find ample difference in terms of length of sentence alone between second and first degree murder. It hardly seems an empty threat that the crime with which one is charged may be increased from one carrying a sentence of "life or not less than twenty years," the prescribed sentence for second degree murder, to one carrying a mandatory life sentence, the prescribed sentence for first degree murder.[14]

The fact that in a particular case the actual impact on the defendant of a charge increase is slight is, of course, not determinative, any more than the fact that a prosecutor may not in fact have acted out of vindictiveness, for the evil to which *Pearce* is directed is the *apprehension* on the defendant's part of receiving a vindictively-imposed penalty for the assertion of rights. Moreover, we would hesitate to distinguish *Pearce* even in a case where the only *possible* prejudicial effect of the charge increase was minimal. The difficulty of drawing the line between those charge increases which do and do not carry sufficient potential impact to require restrictions of the kind imposed in *Pearce* persuades us that all charge increases should in this respect be treated alike.

The government also attempts to distinguish *Blackledge* as a case in which the right whose exercise could be chilled by potential vindictiveness was an "absolute" right, whereas the mistrial which defendants sought in this case was within the discretion of the trial judge to grant. However, the right to a trial *de novo* in North Carolina's two-tier system is "absolute" only in the sense that the statute providing for a new trial provides that no error need be alleged; it may be that North Carolina could deny such a new trial entirely. *Cf.* Griffin v. Illinois, 351 U.S. 12, 18,

---

12. The penalty for the misdemeanor of assault with a deadly weapon, of which Perry was first convicted, was a fine, imprisonment of not more than two years, or both. N.C.Gen.Stat. § 14–33(b), (c) (1969), as amended, N.C.Gen.Stat. § 14–33(b), (c) (Supp.1973). The penalty for the felony of assault with a deadly weapon with intent to kill and inflict serious injury, of which Perry was subsequently convicted, was a fine, imprisonment of not more than ten years, or both. N.C.Gen.Stat. §§ 14–2, 14–32(a) (1969), as amended §§ 14–2, 14–32(a) (Supp.1973).

13. D.C.Code § 22–2404 (1973). *See also* Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ; United States v. Lee, 489 F.2d 1242 (D.C.Cir. 1973).

14. *See* note 13 *supra*.

76 S.Ct. 585, 100 L.Ed. 891 (1956). We cannot say that the right to seek a premature end to unfair proceedings is a significantly less important right. Moreover, even if the right to trial *de novo* in a two-tier system is considered particularly valued because of the likelihood of error in the inferior court, *Pearce* makes it clear that the exercise of post-conviction rights generally are not to be burdened by the possibility of retaliation.

The question for us, therefore, is whether to differentiate between attacks which defendants make on the fairness of criminal proceedings before and after they are complete. We decline to draw such a distinction, primarily because of its "implications . . . for the sound administration of justice." United States v. Tateo, *supra*, 377 U.S. at 466, 84 S.Ct. at 1589. Imposing a ceiling on subsequent indictments after reversals but not after mistrials would discourage defendants from seeking mistrials when error prejudicial to them has occurred, whereas mistrials in such cases may represent a significant saving of judicial resources. At the same time it would encourage prosecutorial efforts to "overreach" and induce mistrials on defendant's motion in exactly the way that the Supreme Court deplored in United States v. Tateo, *supra,* and United States v. Jorn, *supra.*[15]

▮ We conclude then that *Pearce* and *Blackledge* require restrictions on increased charges after mistrials. This does not mean that a higher charge can never be brought. Such a flat prohibi-

tion was explicitly rejected in *Pearce*, 395 U.S. at 723, 89 S.Ct. 2072, and, we do not think that the Supreme Court changed that position in *Blackledge*, a case which substantially relies on *Pearce*. *Cf.* Blackledge v. Perry, 417 U.S. at 35, 94 S.Ct. at 2106 (Rehnquist, J., dissenting).

The course adopted in *Pearce* was to require that the appropriate authority, in that case the sentencing judge, justify his harsher treatment of the defendant in a way which negated the possibility of vindictiveness. There is then the question of how this approach is to apply in the context of increases in the charged offense. It would appear that the reasons for such increases, as well as their factual bases, must be made a part of the record at the time the higher indictment is filed with the court. As to what reasons might be sufficient to justify a sentence increase, one such reason was referred to in *Blackledge*, namely, that the more serious charge could not have been brought when the lesser one was because the elements of the more serious crime were not at that time present, as where the victim of an assault had not yet died, raising the possible charge to one of homicide. Blackledge v. Perry, 417 U.S. at 29 n.7, 94 S.Ct. at 2103 n.7, *citing* Diaz v. United States, 233 U.S. 442, 32 S.Ct. 250, 56 L. Ed. 500 (1912). *See also* Culberson v. Wainright, 453 F.2d 1219 (5th Cir. 1972). A second situation, one which we do not think can be sensibly distinguished from the first, is that in which the government through no fault of its own simply does not learn until after the

---

15. There are other distinctions that might be drawn between the right to seek a mistrial and the right to seek post-conviction review. It might be thought that a prosecutor is less likely to wish to penalize a defendant for seeking a mistrial, which results in less of a burden upon prosecutorial resources than does a successful appeal. However, the distinction all but vanishes in a case, such as the one before us, where the prosecution's presentation was completed before the mistrial was declared. It might also be argued that the undoing of an actual conviction uniquely provokes prosecutorial vindictive-

ness. If defendant is seeking a mistrial, however, there is by hypothesis some error in the trial of which the prosecutor may not wish to lose the benefit. In any case the likelihood of vindictiveness seems if anything greater in the usual mistrial situation than in *Blackledge*, where the indictment for a felony rather than a misdemeanor in the superior court was easily explained in non-vindictive terms by the fact that a felony charge could not be brought in the inferior court. *See* Blackledge v. Perry, 417 U.S. at 32–37, 94 S.Ct. at 2105–2107 (Rehnquist, J., dissenting).

first indictment that the assault victim has died. In other words, a charge increase might in some circumstances be justified by intervening events or by new evidence of which the government was excusably unaware at the time of the first indictment. We do not undertake at this time, any more than did the Supreme Court in *Blackledge*, to anticipate definitively all those circumstances which might be thought to warrant a prosecutor's escalation of an initial indictment.

■ Since this record is devoid of any illumination of the reasons why the first degree murder charge was brought, we can only conclude that the reindictment of appellants for first degree murder denied them due process and that their convictions of that charge cannot stand. In light of our disposition of appellants' double jeopardy claims, the government is free to institute new proceedings consistently with this opinion. At oral argument we invited comment on the question of whether we might remand with directions to enter convictions for second degree murder. Though we do not doubt our authority to do this in certain circumstances, *see* Austin v. United States, 127 U.S.App.D. C. 180, 382 F.2d 129 (1967), we note that the Supreme Court in *Blackledge* emphasized that it is the mere bringing of the higher indictment which denies due process, 417 U.S. 31 & n.8, 94 S.Ct. 2104 & n.8.[16] Since we cannot say that the defendant was not prejudiced by having to defend against the higher, illegal charge, we do not think that course is open to us in this case.

The judgment of the District Court is, except for the conviction of Jamison, Jr., for carrying a dangerous weapon, reversed and the case is remanded with directions to dismiss the indictments of appellants for first degree murder.

It is so ordered.

---

**16.** The majority in *Blackledge* explicitly rejected the dissent's suggestion that Perry's case be remanded for resentencing in accordance with the restrictions on increased sentence imposed by *Pearce*. *See* Blackledge v. Perry, 417 U.S. at 31 n. 8, 94 S.Ct. 2104, 2108 n. 8 (1974).