**Norma A. KOSKI**

v.

**Unwar J. SAMAHA, Clerk, Rockingham County Superior Court.**

Civ. No. 80-95-D.

United States District Court,
D. New Hampshire.

June 4, 1980.

Addendum Opinion and Order
June 23, 1980.

Benjamin Hiller, Cambridge, Mass., for plaintiff.

Peter W. Mosseau, Concord, N. H., for the State of New Hampshire.

## OPINION AND ORDER

DEVINE, Chief Judge.

Habeas corpus petitioner Norma A. Koski is one of a number of persons who were arrested for criminal trespass on Monday, May 2, 1977, following a weekend-long demonstration at the construction site of the Seabrook, New Hampshire, nuclear power

plant. On May 13, 1977, petitioner was found guilty of that offense by Hampton District Court Justice Douglas R. Gray, who imposed a fine of one hundred dollars ($100.00) and sentenced her to fifteen days imprisonment at the Rockingham County House of Correction. Following a trial *de novo* at the Rockingham County Superior Court, petitioner was again so convicted by a jury on May 23, 1979. Superior Court Justice Arthur E. Bean, Jr., then sentenced Ms. Koski to six months in the Rockingham County House of Correction (with three months suspended and 13 days credited for time already served) and ordered her to pay a fine of two hundred dollars ($200.00). On February 14, 1980, the New Hampshire Supreme Court (per Bois, J.) affirmed this conviction and sentence. *State v. Koski*, 120 N.H. ——, 411 A.2d 1122 (1980). The instant petition for habeas corpus was filed with this court on February 29, 1980, and both parties have since filed motions for summary judgment.[1] The Court has reviewed supporting memoranda filed by the parties as well as the record before the Supreme Court of New Hampshire in this matter (as certified and transmitted by the Deputy Clerk of the Supreme Court).

Petitioner points to a number of aspects of her superior court trial as being constitutionally infirm. Taken in order of their occurrence at trial, these alleged infirmities include (1) the trial court's refusal to allow a hearing on the use of the competing harms defense, (2) its refusal to allow defendant's mother to testify as to statements made by defendant prior to committing the act in question, (3) the wording of the court's charge to the jury as to the element of knowledge (both as to what is required by N.H. RSA 635:2 and as to the bearing of petitioner's belief, albeit mistaken, in the applicability of the competing harms statute, N.H. RSA 627:3), and (4) the nature of the sentence imposed. As to this last category, petitioner alleges that her superior court sentence is disproportionate to the offense committed and in comparison with sentences imposed upon others convicted of the same offense, that its harsher terms than those imposed by the district court are violative of due process as their intention and effect was to discourage pursuit of the right to a trial *de novo*, and that its harshness was based on an unconstitutional antagonism toward civil disobedience on the part of the court. As this Court finds for the reasons stated hereinafter that the writ of habeas corpus must issue on account of the actions of the prosecutor in threatening petitioner with a higher sentence if she pursued her right to a trial *de novo*, we do not address her other allegations.

■ Like many other states, New Hampshire has a two-tier system for adjudicating less serious criminal cases. *See Colten v. Kentucky*, 407 U.S. 104, 112, 92 S.Ct. 1953, 1958, 32 L.Ed.2d 584 (1972). As established under the authority of this state's constitution (N.H.Const. pt. II, art. 77), that system provides that a person charged with a misdemeanor such as criminal trespass (N.H. RSA 635:2) may be tried initially without a jury in the district court for the district wherein the offense was committed. *State v. Handfield*, 115 N.H. 628, 629, 348 A.2d 352, 353 (1975), *appeal dismissed* 427 U.S. 909, 96 S.Ct. 3196, 49 L.Ed.2d 1201 (1976); RSA 502–A:11.[2] If found guilty, a person so charged is given the right to appeal to the superior court with a trial by jury unless waived. *Handfield, supra* ; RSA 592–A:2, RSA 502–A:12, RSA 599:1. The effect of such an appeal is to vacate the district court's judgment and transfer the whole proceeding for trial *de novo* on the original complaint, unless amended, or on an information substituted for the original complaint. *State v. Green*, 105 N.H. 260, 261, 197 A.2d 204, 205 (1964).

---

1. Respondent filed his "Motion to Dismiss or for Summary Judgment" on March 11, 1980, whereas petitioner's "Motion for Summary Judgment" was filed on April 16, 1980.

2. Under N.H. RSA 592–A:1, the superior court also has original jurisdiction over misdemeanor cases but in its discretion "may dismiss a prosecution originally begun therein which is within the jurisdiction of a municipal [district] court". *State v. Blouin*, 110 N.H. 202, 203, 263 A.2d 677, 678 (1970). (*See* RSA 502–A:34 which vested district courts with the jurisdiction of municipal courts.)

As we noted in *Tsoumas v. State of New Hampshire*, 472 F.Supp. 1134, 1135 (D.N.H. 1979), *aff'd*, 611 F.2d 412 (1st Cir. 1980), approximately 1400 anti-nuclear demonstrators were arrested following the demonstration in which petitioner was a participant. As indicated in the July 3, 1979, Opinion and Order Re 1977 Trespass Cases of the Rockingham County Superior Court, the prospect of having to conduct *de novo* superior court trials in each of these cases as is mandated by the above two-tier arrangement placed a severe strain upon that county's judicial and prosecutorial resources. Appended to petitioner's brief before the Supreme Court of New Hampshire are four documents that reveal the prosecution's response to this situation.

In the first of these documents—a newspaper story—the opening line reports that "Anti-nuclear demonstrators appealing convictions on criminal trespass charges may end up with stiffer sentences by the time they leave Superior Court, Assistant County Attorney Peter McFarlane said yesterday." Referring to the 30-day-sentence/$100-fine dispositions that had been previously meted out in most cases by the district court, McFarlane (who reportedly prosecuted most of those cases at that earlier stage) was quoted later in the article as stating "I can do a lot worse by them than that. If they're found guilty here (in Superior Court) I'll recommend a six month jail sentence." [3] The second document is a sworn affidavit by petitioner herself executed on October 1, 1979, wherein Ms. Koski states that

> I was in Rockingham Superior Court on May 21, 1979, about to go in for the drawing of the jury, when Assistant County Attorney Peter A. McFarlane pointed his finger at me and said, "Remand now back to District Court. We're slapping them with six-month sentences. I don't care if you're a nun, or what, we're slapping them with six-month sentences. Remand now."

The third document is a sworn affidavit dated October 1, 1979, of one Scott F. Brown, an anti-nuclear demonstrator who, like petitioner, was arrested during the weekend of May 1, 1977, and whose case was processed within the two-tier system described above. Mr. Brown relates that during the morning of March 12, 1979, when he was at the Rockingham County Superior Court on matters related to his arrest,

> Mr. McFarlane turned to me and said that he did not see why people were carrying forward with appeals in these cases since the issues had already been decided by the verdicts of four juries in previous cases of similar origin, and by certain findings in the State Supreme Court. He then suggested to me that the correct thing for individuals to do would be to withdraw their appeals and return to the District Court for imposition of sentence. He further stated that the County Attorney's office was recommending six month jail sentences for convictions in these cases. I told him that I felt he was mistaken, and that in any case individuals had a constitutional right to a jury trial. He continued to say "I understand that the District Court is suspending sentences in these cases, and that people are not serving time."

> The net effect of this interchange, and I believe that this was calculated on Mr. McFarlane['s] part, was to make the excercise [sic] of my right to an appeal and a jury trial if necessary seem to carry an inordinate risk. I was further confused because I had checked with John Clark, clerk of the Hampton District Court, on the previous Friday and had be[en] given much different information. I believe that Mr. McFarlane['s] remark was part of a calculated attempt on the part of the County Attorney['s] office to discourage appeals in Seabrook cases. I say this

---

**3.** In the table of authorities of petitioner's Supreme Court brief, as well as in the brief of Mark Carter Wentworth at page 23, contained in the records of this court in *Wentworth v. Samaha*, 472 F.Supp. 1134 (D.N.H.1979), this article was identified as having appeared in the January 18, 1979, issue of the Manchester Union Leader at pages 1 and 22. The Manchester Union Leader is this state's only daily newspaper having statewide circulation.

because on a number of other occaisons [sic] both Mr. Eldredge and Mr. Pudloski echoed Mr. McFarlane[']s remarks, although without the attempt at boldfaced deception concerning the suspension of the senttence [sic] at District Court.

While this incident in particular did not cause me to withdraw my appeal, it was one of many incidents which occured [sic] between March and June which eventually intimidated me to the point of doing just that.

The fourth document, also a sworn affidavit, was executed on October 3, 1979, by Benjamin Hiller, a Massachusetts lawyer who sat with and advised petitioner with her *pro se* defense in the superior court and who has acted as her attorney for purposes of Supreme Court appeal and this habeas corpus petition. With regard to his experiences at the Rockingham County Superior Court in connection with the cases similar to petitioner's, Mr. Hiller states as follows:

I was present in Rockingham County Superior Court on a number of occasions during the period from January thru May of 1979. My presence in the Court coincided with the arraignments, motion sessions, and trials of numerous persons who had been arrested for protesting construction of the Seabrook Nuclear Power Plant during 1976 thru 1978.

On at least three occasions statements were made to me or in my presence by Assistant County Attorney Peter McFarland [sic] which relate to the matter before this Court. At those times, and I have been informed, at other times, Mr. McFarland [sic], who was largely responsible for the prosecution of the Seabrook cases, urged defendants to remand their cases back to District Court for imposition of sentence. He made plain the threat that for those who went forward with trials in Superior Court there would be greatly increased jail sentences.

I am personally aware of a number of persons who remanded their cases back to

District Court and foreited [sic] their right to a jury trial in Superior Court because of fear of such increased sentences.

▇▇▇ It should be noted that while the above four documents were appended to petitioner's Supreme Court brief which in turn was included among those documents certified here to be the record before the Supreme Court of New Hampshire, they were not part of the record transmitted from the Superior Court to the Supreme Court in the reserved case and thus technically were not properly before it on appeal. *See* Rule 4 of the Rules of the Supreme Court of the State of New Hampshire (effective March 1, 1972, and Rule 79 of the Rules of the Superior Court of the State of New Hampshire (effective January 1, 1977).[4] Moreover, these documents were not (and given their dates of execution could not have been, with the exception of the newspaper article) presented to the Superior Court prior to its transferral of the case. Nevertheless, respondent did not object before the Supreme Court either to their inclusion or to consideration of them despite commenting on other aspects of petitioner's brief, (*see* State's brief before the Supreme Court of New Hampshire at 10, 14). Given respondent's apparent acquiescence in petitioner's injection of these papers into the appellate record and the Supreme Court's own willingness to recognize the existence of at least one of the documents (*see State v. Koski, supra,* 411 A.2d at 1124), this Court views them as having been properly presented *without objection* to, and fully considered by, the state courts. Moreover, given respondent's repeated failure to object to or to counter the statements made in the above four documents before either the Supreme Court or this Court, and the opportunity that the state courts have had to consider them, we find that no further evidentiary hearing thereon

---

**4.** The current rules of the supreme and superior courts, which took effect on July 3, 1979, do not apply to reserved cases submitted to the superior court for filing with the Supreme Court on or before July 2, 1979. Petitioner's case was reserved and transferred by Justice Bean on June 11, 1979. *Cf.* Supreme Court Rules 13, 17 (effective July 3, 1979).

is necessary and proceed to consideration of their constitutional significance.[5]

■ Although it has never been held that a state must, as New Hampshire has done, create a two-tier system of criminal adjudication, "it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts." *Rinaldi v. Yeager*, 384 U.S. 305, 310, 86 S.Ct. 1497, 1500, 16 L.Ed.2d 577 (1966), quoted in *North Carolina v. Pearce*, 395 U.S. 711, 724, 89 S.Ct. 2072, 2080, 223 L.Ed.2d 656 (1969), and *Blackledge v. Perry*, 417 U.S. 21, 25 n. 4, 94 S.Ct. 2098, 2101, 40 L.Ed.2d 628 (1974). In the *Pearce* case, the defendants had been convicted and sentenced to prison terms, which convictions were set aside in later state proceedings. On retrial, defendants were again convicted, but their new sentences amounted to longer total periods of incarceration than were originally imposed. Noting that neither of the states involved had attempted to explain or justify these increases in punishment, the United States Supreme Court upheld the relief that had been granted by the federal district courts on habeas in light of the following conclusions:

Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.

In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

395 U.S. at 725–26, 89 S.Ct. at 2080–2081.[6]

As the *Pearce* case involved defendants charged with serious crimes, the two-tier aspects of a state's system of criminal adjudication of misdemeanors was not directly implicated. The *Blackledge* case, however, dealt with a situation wherein the defendants, following a misdemeanor conviction without a jury in a state district court, filed

---

**5.** We note that under 28 U.S.C. § 2254, Rule 7, Expansion of Record:

(a) Direction for expansion. If the petition is not dismissed summarily the judge may direct that the record be expanded by the parties by the inclusion of additional materials relevant to the determination of the merits of the petition.

(b) Materials to be added. The expanded record may include, without limitation, letters predating the filing of the petition in the district court, documents, exhibits, and answers under oath, if so directed, to written interrogatories propounded by the judge. Affidavits may be submitted and considered as part of the record.

(c) Submission to opposing party. In any case in which an expanded record is directed, copies of the letters, documents, exhibits, and affidavits proposed to be included shall be submitted to the party against whom they are to be offered, and he shall be afforded an opportunity to admit or deny their correctness.

The Advisory Committee note to Rule 7 indicates that the purpose of the rule "is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing."

**6.** In the case of the North Carolina defendant, the federal court ordered his release upon failure of the state court to resentence him within 60 days. As to the Alabama defendant, United States District Judge Johnson ordered his release in that defendant had already served more than enough time to satisfy the originally imposed sentence. (Judge Johnson also ordered that the defendant was entitled to have that excess time served credited to two other sentences as originally imposed.) *Rice v. Simpson*, 274 F.Supp. 116, 123 (M.D.Ala.1967).

a notice of appeal for a trial *de novo* in the superior court. Prior to defendant's appearance for the trial *de novo*, the prosecutor obtained a grand jury indictment charging defendant with a felony based on the same facts that had formed the basis of the earlier misdemeanor charge. Based on its conclusion that the possibility of increased punishment in that situation posed a "realistic likelihood of 'vindictiveness'" on the part of the prosecutor, the Supreme Court held that due process of law required application of a rule analogous to that of the *Pearce* case. In thus upholding the District Court's issuance of a writ of habeas corpus, the Supreme Court declared that "[a] person convicted of an offense is entitled to pursue his statutory right to a trial *de novo*, without apprehension that the State will retaliate by substituting a more serious charge for the original one, thus subjecting him to a significantly increased potential period of incarceration." 417 U.S. at 28, 94 S.Ct. at 2102–3.

In the more recent case of *Lovett v. Butterworth*, 610 F.2d 1002 (1st Cir. 1979), *petition for cert. filed* No. 79–1308, 48 U.S. L.W. 3570 (Feb. 25, 1980), the First Circuit was presented with a claim of prosecutorial vindictiveness similar to that involved in *Blackledge*. Defendant Lovett was sentenced to two and one half years imprisonment following a non-jury trial before a Massachusetts district court and thereafter exercised his right to appeal for a trial *de novo* before a superior court. While the appeal was pending, the Commonwealth obtained a grand jury indictment on identical facts that charged Lovett with a crime which carried a greater sentence upon conviction and which lay within the exclusive jurisdiction of the superior court. Following a trial by jury in that court on the later charge, Lovett was convicted and sentenced to ten-to-twenty years' imprisonment whereupon the complaint upon which he had been convicted in the district court was dismissed on the State's motion. Rejecting the Commonwealth's argument that its charging of Lovett at the district court level amounted to inadvertent and excusable prosecutorial error, the First Circuit

concluded that Lovett's interest in an unfettered exercise of his right to appeal represented a significant due process interest as compared to a minor or nonexistent prosecutorial interest. The First Circuit thus remanded Lovett's case with instructions that the writ of habeas corpus be granted, citing *Jackson v. Walker*, 585 F.2d 139, 143 (5th Cir. 1978) for the proposition that "*Blackledge* sets up a per se rule . . . that in some situations a due process violation can be established by a showing that defendants might have a reasonable apprehension of prosecutorial vindictiveness, without a showing that the prosecutor actually had a vindictive or retaliatory motive to deter appeals", and *United States v. Tucker*, 581 F.2d 602, 605 (7th Cir. 1978) for its holding that "[t]he semblance of vindictiveness that arises from the imposition of a harsher sentence the second time around must be obviated so that the proceedings do not leave the impression of unfairness to the defendant . . . and so that other defendants are not deterred from exercising rights of appeal due to apprehension of vindictiveness."

■ The question here presented is whether, on the facts of this case, application of the rules set forth in *Pearce, Blackledge,* and *Lovett* is warranted so that the writ should issue. At the outset, we note that petitioner Koski's interest in a free and unfettered exercise of a right to appeal for a trial *de novo* by jury in the superior court and the county prosecutor's stake in discouraging such appeals (which expend scarce prosecutorial resources) are identical to those interests which were weighed in *Lovett, supra,* wherein the Court found in the defendant's favor. Nevertheless, respondent argues that this case is distinguishable in that here "any prosecutorial vindictiveness was reflected only in the recommendation of sentence and was not translated into any increase in the charge against the Petitioner." (Respondent's motion at 11.) Because due process principles apply to enhanced sentences as well as enhanced charges, *Lovett, supra,* 610 F.2d at 1004, respondent's claim boils down to the

contention that no due process violation can be made out here based on the prosecutor's actions since "it is not the prosecutor who does the sentencing." (Brief for the State before the New Hampshire Supreme Court at 13.)

■ While somewhat appealing on its face, respondent's argument loses persuasiveness when the facts of this case are examined in light of the purposes of the rule set forth in *Pearce, Blackledge*, and *Lovett*. The First Circuit has noted that the above " 'prophylactic rule is designed not only to relieve the defendant who has asserted his right to appeal from bearing the burden of the prosecutor's "upping the ante" but also to prevent chilling the exercise of such rights by other defendants who must make their choices under similar circumstances in the future' ". *Lovett, supra*, 610 F.2d at 1006, *quoting from United States v. DeMarco*, 550 F.2d 1224, 1227 (9th Cir.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977). Consistent with the requirements of due process, a major goal of the rule is to ensure that a defendant "not have to fear even the possibility that his exercise of his right to appeal will result in the imposition of a direct penalty for so doing." *Marano v. United States*, 374 F.2d 583, 585 (1st Cir. 1967), *cited in Lovett*, at 1002. In this regard, the evil to which the prophylactic rule is directed is the *apprehension* on a defendant's part of receiving a vindictively-imposed penalty for the assertion of rights. *United States v. Jamison*, 505 F.2d 407, 415 (D.C.Cir.1974). *See also United States v. Andrews*, 444 F.Supp. 1238, 1240 (E.D.Mich.1978), noting that "it is the apprehension that there may be retaliatory action, not the procedural state of facts, which implicates due process."

■ In light of the above considerations, it is not necessary in order to conclude that due process has been violated to find that a prosecutor actually has the means to implement an increased sanction posed to a defendant as a consequence of his exercise of a right to appeal, but only to determine whether a defendant could reasonably fear that the prosecutor had the power to carry out threats made. The reasonableness of that apprehension is, of course, determined from the circumstances surrounding the interaction of defendant and prosecutor.

■ The interaction that occurred in this case cannot accurately be assessed without viewing petitioner's particular prosecution in the context of the prosecutor's response to the entire problem posed by having to process the cases of the hundreds of other demonstrators similarly arrested. In November of 1977, trials of three other anti-nuclear demonstrators arrested on May 1 and 2, 1977, took place in Rockingham County Superior Court. Following verdicts of guilty, the prosecution recommended that Carolyn Jean Dupuy (a nun), Court Dorsey, and Mark C. Wentworth be sentenced to six-month jail sentences.[7] In response, the Superior Court sentenced Dupuy to a six months' jail sentence with four months suspended, Dorsey to six months with three months suspended, and Wentworth to six months with two months suspended.[8] In his Manchester Union Leader interview that appeared in the January 18, 1979, issue, Assistant County Attorney Peter McFarlane made reference to these past trials, stating that *"one* reason" he would be recommending a tougher sentence for those who chose to appeal to the superior court was "to be consistent with what the Court has done in the past." (Emphasis

---

7. In each of these cases, the prosecutor also recommended that all but 15 days of the sentence be suspended (*State of New Hampshire v. Dupuy*, 118 N.H. 848, 395 A.2d 851, *Dorsey*, Supreme Court Docket No. 78–154, transcript at 206; *Wentworth v. Samaha*, 472 F.Supp. 1134 (D.N.H.1979), and in the cases of *Dupuy* and *Dorsey*, it was recommended that 13 days for pre-trial confinement be credited against the 15 days.

8. A fourth case tried in November of 1977 involved one Roger P. Cole, who had been arrested in the course of the Seabrook demonstration that occurred in the latter part of August of 1976. Cole was found guilty in the Superior Court and sentenced to 6 months with 3 months suspended. His district court sentence had been for 30 days. (*State of New Hampshire v. Cole*, 118 N.H. 829, 395 A.2d 189).

added.) County Attorney Carleton Eldredge is also quoted later on in the article as saying "*Part* of what we should be doing is discouraging this kind of law breaking. I've yet to hear anyone say, 'I repent, I'm sorry, I won't do it again.' On the contrary, they arrogantly announce that they'll do the same thing again." (Emphasis added.) Notwithstanding these statements of *some* "legitimate" factors that would motivate the recommendation of higher sentences at the superior court level, it is obvious from the remainder of the prosecution's remarks as quoted earlier that their intent was to discourage demonstrators such as petitioner from exercising their rights to *de novo* trials in the future. Just before petitioner's trial she was confronted directly with this threat of retaliatory action in such a way as to leave no doubt as to its real objective: "Remand now to District Court. *We're* slapping them with six-month sentences. I don't care if you're a nun, or what, we're slapping them with six-month sentences. Remand now." (Emphasis added, Oct. 1, 1979, affidavit of *Koski, supra*). From the vantage point of petitioner, who had less than a high school education, who planned to appear *pro se* (as was her right, *see* Annot., 98 A.L.R.3d 13 [1980]),[9] and who like others had had no previous opportunity to become acquainted with the court system, the language used by the prosecutor could hardly have failed to create the impression that the prosecutor himself could guarantee that an increased sentence would be imposed if petitioner chose to appeal her 15-day district court sentence. And the prosecutor's emphasis upon the six month figure coupled with his reference to the *Dupuy* case where that term had been im-

posed would tend to confirm in petitioner's mind that a jail term of six months' duration would most certainly follow a superior court conviction. Under the circumstances facing petitioner at the time the prosecutor made remarks directly to her, the Court does not believe she would have appreciated that in the past anti-nuclear demonstrator cases set forth above, the prosecution had actually recommended that most of the six-month sentence be suspended (or that it was the judge himself who in each case allowed less of the sentence to be suspended). In sum, the Court finds that it would have been reasonable for petitioner (as was the case with affiant Scott F. Brown) to fear that the prosecution could and would carry out the retaliatory threat of "slapping" her with a six-month sentence if she decided to exercise her right to be tried at the superior court level.

That petitioner herself did not knuckle under to this pressure to remand as did others (*see* affidavits of Brown and Hiller) does not affect her standing to complain of prosecutorial vindictiveness. *See DeMarco, supra,* 550 F.2d at 1227. As pointed out by the *DeMarco* court, the prophylactic rule of *Blackledge* and *Pearce* has the dual purpose of relieving a defendant who has asserted his right from bearing the burden of the retaliatory action as well as to prevent chilling the exercise of such rights by other defendants similarly situated in the future. Notwithstanding the validity *vel non* of the sentencing judge's motives, because petitioner did receive the promised six-month penalty she and others could justifiably conclude that the prosecution meant what it said.[10]

---

**9.** Petitioner did not receive help from "standby" counsel until the drawing of her jury (Trial Transcript at 3–6).

**10.** From the transcript of petitioner's trial, it appears that the prosecution in its recommendation to the sentencing judge took an even harsher approach toward petitioner than it had in the previously tried cases of anti-nuclear demonstrators Dupuy, Dorsey, and Wentworth. Whereas the prosecution had recommended that all but 15 days be suspended from the six-month sentences of those defendants, it recommended that only two months be suspended

from Ms. Koski's. (Trial Transcript at 77.) And while the prosecutor once again attempted (as it had in the Manchester Union Leader interview) to justify its recommendation for Ms. Koski on grounds of consistency with past cases, it is significant that the recommended suspension of only two months of her sentence tracked the longest of the sentences ultimately imposed in the three previous cases (that of Mark C. Wentworth). Among these four cases of demonstrators arrested during the May 1, 1977, weekend, Ms. Koski's is unique in that the sentence imposed by the judge was less

Respondent further argues that under the holding of *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), this Court cannot find that petitioner's increased sentence posed a "realistic likelihood of 'vindictiveness'" as was the case in *Blackledge, supra*. In *Colten*, the United States Supreme Court found that as a trial *de novo* on the same charge represented a "completely fresh determination of guilt or innocence", the possibility of vindictiveness on the part of the sentencing judge found to exist in *Pearce, supra*, was not inherent in the Kentucky two-tier system. 407 U.S. at 116–117, 92 S.Ct. at 1960. Our holding here is not premised, however, upon any claim of vindictiveness on the part of the trial judge, but rather upon prosecutorial vindictiveness. As emphasized by the Court in *Blackledge*, which similarly involved a two-tier system of criminal adjudication, "the central figure is not the judge or the jury, but the prosecutor." 417 U.S. at 27, 94 S.Ct. at 2102. That due process claims of vindictiveness on the part of a prosecutor in a two-tier system may be cognizable whereas similar claims of judicial vindictiveness may not can be explained by the fact that

> policies favoring judicial discretion and flexibility in sentencing, *see Colten v. Kentucky*, 407 U.S. 104, 112–19, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) do not apply to the prosecutor. 'There is no doubt that the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse. And broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise.' *Bordenkircher v. Hayes*, 434 U.S. 357, 365, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).[11]

*Lovett, supra*, 610 F.2d at 1005.

Here the limits of due process dictate that the prosecutor (who unlike the superior court judge appeared in a number of these cases at both the district and superior court trials) not be allowed to create in an unknowing defendant's mind the impression that the prosecutor himself can insure imposition of a higher sentence upon appeal and thus place a defendant in fear of that consequence should she exercise a right vested in her by the State itself. As the court in *United States v. Andrews, supra*, 444 F.Supp. at 1244 has so aptly stated: "The prosecutor is not merely an advocate. He or she is 'an administrator of justice' as well. . . . 'The duty of the prosecutor is to seek justice, not merely to convict.'" (Citations omitted.) The *Blackledge* Court's holding that violations of due process may be grounded upon a conclusion that a situation poses a "realistic likelihood of vindictiveness" was derived in part from its earlier perception in *Pearce* that "[t]he existence of a retaliatory motivation would, of course, be extremely difficult to prove in any individual case." 395 U.S. at 725 n. 20, 89 S.Ct. at 2080. This case concerns that rare situation where a prosecutor directly confronts a defendant at a critical moment with blatant threats of an increased sentence should she exercise her right to a trial *de novo*. Due process of law requires that a defendant be freed of apprehension of such a retaliatory motivation and that the potential for prosecutorial vindictiveness not be allowed to enter New Hampshire's two-tier appellate process.

Petitioner Koski's exercise of her right to a *de novo* trial effectively vacated her district court sentence. *State v. Green, supra; State v. Cook*, 96 N.H. 212, 214, 72 A.2d 778, 779 (1950). Because retrial or resentencing at the superior court level would have no purging effect upon the prosecutorial vindictiveness that has tainted

---

severe as to the amount suspended than that recommended by the prosecution.

**11.** Unlike this case, which concerns the impact of prosecutorial vindictiveness on the exercise of rights in a two-tier system, *Bordenkircher* involved the question whether due process is violated when a state prosecutor carries out a threat made during plea negotiations to reindict the accused on more serious charges if he did not plead guilty to the offense with which he was originally charged.

petitioner's case (*see Blackledge, supra*, 417 U.S. at 30–31, 94 S.Ct. at 2103–2104), and because the Court perceives that the *Blackledge* prophylactic rule's purpose of preventing the chilling of the exercise of rights of other defendants similarly situated in the future will best be served by releasing petitioner completely from custody, the writ of habeas corpus is hereby granted.

SO ORDERED.

### ADDENDUM TO OPINION AND ORDER

Since the filing of our Opinion and Order dated June 4, 1980, the Court has received the June 1980 edition of Shepard's Federal Citations which indicates that the therein-cited case of *United States v. Andrews*, 444 F.Supp. 1238 (E.D.Mich.1978) has been reversed and remanded by a sharply divided court of the Sixth Circuit. 612 F.2d 235 (6th Cir. 1979) (as amended February 15, 1980). The *Andrews* case involved a situation where the prosecution sought and obtained, prior to the initial trial and following defendants' successful appeal from denial of bail, a superseding indictment containing an additional charge of conspiracy.

This particular procedural context was critical to the outcome of the case at the Circuit level, and represented the focal point of disagreement among the authors of the majority, concurring, and dissenting opinions. From our reading of those opinions, we believe that all three members of that Sixth Circuit panel would agree with our finding of a due process violation in this case, where the prosecution threatened petitioner with a higher sentence at the time of the exercise of her right to appeal for a retrial *de novo*.