**Norma A. KOSKI, Plaintiff, Appellee,**

v.

**Unwar J. SAMAHA, Clerk, Rockingham County Superior Court, Defendant, Appellant.**

**No. 80–1452.**

United States Court of Appeals, First Circuit.

Argued Oct. 10, 1980.

Decided May 20, 1981.

791

grant of *habeas corpus*[1] to Norma A. Koski, freeing her from a state conviction for criminal trespass.

I.

New Hampshire has a two-tiered system for criminal trials, not unlike that described in *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). Defendants are first tried before a judge in the state district court. If convicted, they have a right to demand a trial *de novo* before a jury in the superior court, the latter being New Hampshire's trial court of general civil and criminal jurisdiction. In the present case, Norma A. Koski was one of about 1,400 persons arrested while demonstrating against the construction of a nuclear power plant on May 1 and 2, 1977. The arrest grew out of the "occupation" of the plant site; Koski was charged with criminal trespass under N.H.Rev.Stat.Ann. § 635:2, an offense carrying a maximum penalty of one year's imprisonment and a fine of $1,000. N.H.Rev.Stat.Ann. § 651:2. Along, it seems, with many others, she was tried and convicted in the Hampton District Court on May 13, 1977. She was sentenced to 15 days' imprisonment, with 13 days credit for time already served, and a $100 fine. Like most others, Koski then demanded a *de novo* trial, with the result that her sentence was vacated and a new proceeding instituted against her on the identical charge in the Rockingham County Superior Court. Her case was not reached until May 1979, at which time she was tried and found guilty by a jury. During this trial Koski insisted upon appearing pro se, although counsel sat with her in the courtroom. The justice who presided at the trial thereupon sentenced her to six months' imprisonment, with three months suspended and a $200 fine. (This sentence involved a month's less actual imprisonment than had been recommended by the Assistant County Prosecutor, who recommended six months' imprisonment with two months suspended.)[2]

Donald J. Perrault, Claremont, N. H., Atty., with whom Gregory H. Smith, Acting Atty. Gen., and Brian T. Tucker, Concord, N. H., Atty., were on brief, for defendant, appellant.

Benjamin Hiller, Cambridge, Mass., by appointment of the court, for plaintiff, appellee.

Before COFFIN, Chief Judge, PELL * and LEVIN H. CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The Attorney General of New Hampshire brings this appeal from the district court's

* Of the Seventh Circuit, sitting by designation.

1. *Koski v. Samaha*, 491 F.Supp. 432 (D.N.H. 1980).

2. In November 1977, one and a half years before Koski's *de novo* trial, three other of the 1977 anti-nuclear demonstrators were tried *de novo* in Rockingham County Superior Court.

Koski appealed her conviction to the Supreme Court of New Hampshire. *State v. Koski*, 120 N.H. 112, 411 A.2d 1122 (1980). In her appeal she argued that the superior court had failed to state an element of the offense of criminal trespass in its charge to the jury. She also insisted that she had a constitutional due process right to a so-called competing harms defense, *i. e.*, based on her belief that she had a license or privilege to be on the property because of the overriding hazard from nuclear activity. She further claimed error in the superior court's refusal to let her mother testify to explain "what I was doing and why" in going on the property. And finally she attacked her three months' jail sentence as disproportionate under the eighth amendment, as violative of equal protection and freedom of speech, and also as violative of due process because it was significantly harsher than her initial sentence and designed to discourage appeals by other co-defendants. To support this last claim Koski appended to her brief in the Supreme Court of New Hampshire a newsclipping,[3] and three affidavits, one of which was her own:

"I, Norma Koski ... say that I was in Rockingham Superior Court on May 21, 1979, about to go in for the drawing of the jury, when Assistant County Attorney Peter A. McFarlane pointed his fin-

---

Each received a six months' sentence with two to four months suspended; the prosecutor in those initial trials recommended that all but 15 days of imprisonment be suspended and, in two of the cases, that 13 days be credited for pretrial confinement. *Koski, supra*, 491 F.Supp. at 439 & n.7. State appeals taken in two of the cases proved unsuccessful. *State v. Wentworth*, 118 N.H. 832, 395 A.2d 858 (1978); *State v. Dorsey*, 118 N.H. 844, 395 A.2d 855 (1978). Federal relief was later granted in one, *Wentworth v. Samaha*, 472 F.Supp. 1134 (D.N. H.1979), *aff'd*, 611 F.2d 412 (1st Cir. 1980), for reasons not relevant here.

Also in November 1977, a fourth case was tried involving a defendant arrested in connection with an earlier demonstration at the same nuclear power plant in August 1976. He had been sentenced to 30 days by the district court and after trial *de novo* was sentenced by the Rockingham County Superior Court to six months, with three months suspended. *Koski, supra*, 491 F.Supp. at 439 n.8. On appeal to the New Hampshire Supreme Court his conviction was vacated and the charges against him dismissed for lack of a speedy trial as required by the New Hampshire constitution. *State v. Cole*, 118 N.H. 829, 395 A.2d 189 (1978).

It is of interest that soon after Koski's conviction in May 1979, the judges of the Rockingham County Superior Court granted a motion to dismiss, for lack of speedy trial, the many other pending cases involving Koski's companions. In their "Opinion and Order Re 1977 Trespass Cases," the court stated that the administration of justice in the superior court system of New Hampshire would be brought to a halt if these cases were brought to trial, "imposing a burden upon the taxpayers which would be highly disproportionate to any result sought to be achieved." In Koski's brief in the federal district court, it is stated that Koski "had declined to move" for dismissal of her own case on speedy trial grounds.

3. The article was entitled, "Sentences May Jolt Anti-Nukes," and read in part as follows:

"Anti-nuclear demonstrators appealing convictions on criminal trespass charges may end up with stiffer sentences by the time they leave Superior Court, Assistant County Attorney Peter McFarlane said yesterday.

"Most of the demonstrators appearing in Rockingham County Superior Court this week have been fined $100 and sentenced to 30 days in the county House of Correction in Brentwood for trespassing on Public Service Company of New Hampshire property during anti-nuclear demonstrations at Seabrook in August, 1976. Both the fines and sentences were suspended during good behavior, however.

" 'I can do a lot worse by them than that,' said McFarlane, who prosecuted most of the cases in Hampton District Court. 'If they're found guilty here (in Superior Court), I'll recommend a six month jail sentence.'

"One reason for recommending a tougher sentence, said McFarlane, is 'to be consistent with what the court has done in the past.' Four previous cases, when appealed to Superior Court, resulted in six month sentences for the defendants, he said, with varying portions of the sentences suspended.

\* \* \* \* \* \*

"Citing what he called 'the increasing seriousness of the offense,' McFarlane said a six month jail sentence would be the 'minimum' that the prosecution would seek in Superior Court. Under New Hampshire law a maximum sentence of one year in jail and a $1,000 fine may be imposed for criminal trespass.

" 'Part of what we should be doing,' County Attorney Carleton Eldredge added, 'is discouraging this kind of law breaking. I've yet to hear anyone say, "I repent, I'm sorry, I won't do it again." On the contrary, they arrogantly announce that they'll do the same thing again.' "

ger at me and said, 'Remand now back to District Court. We're slapping them with six-month sentences. I don't care if you're a nun, or what, we're slapping them with six-month sentences. Remand now.' "[4]

The New Hampshire court rejected all of these contentions and affirmed. With respect to Koski's claim that the higher sentence after *de novo* trial violated due process, the court cited *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); and *Lovett v. Butterworth,* 610 F.2d 1002 (1st Cir. 1979), *cert. denied,* 447 U.S. 935, 100 S.Ct. 3038, 65 L.Ed.2d 1130 (1980), and acknowledged it was "well established" that a heavier penalty could not properly be exacted "merely because the defendant chooses to exercise his right to a new trial." As the court pointed out, *Pearce, Blackledge* and *Lovett* stand "as a check against both prosecutorial and judicial vindictiveness, and also prevent the chilling of the exercise of such rights by other defendants who must make their choices under similar circumstances in the future." 120 N.H. at 116, 411 A.2d at 1124. Looking in general to the problem of a harsher sentence being imposed at the second tier of a two-tier system, the court quoted language from *Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), to the effect that since a *de novo* trial represents a completely fresh determination of guilt or innocence, and is not an "appeal on the record," a later more severe sentence is not a vindictive penalty in such a proceeding. 407 U.S. at 116–18, 92 S.Ct. at 1960–61. As to the specific case before it, though the documents submitted by Koski were not proper-

ly part of the appellate record under the rules of the Supreme Court of New Hampshire, *see Koski, supra,* 491 F.Supp. at 436, the supreme court took notice of the newspaper clipping by criticizing the prosecutor for the remarks he was reported to have made. (The State did not move to have the documents excluded nor did the supreme court exclude them sua sponte.) Nevertheless, the court expressly found no "indicia of vindictiveness on the part of either the judge or prosecutor in this case" and concluded its opinion with the further finding that "[t]he sentence in this case was not imposed to deter de novo trials, but to deter illegal actions ...." 120 N.H. at 117, 411 A.2d at 1125.

Upon losing in the Supreme Court of New Hampshire, Koski petitioned for habeas corpus in the District Court for the District of New Hampshire.[5] Acting on cross-motions for summary judgment, the district court granted the writ. *Koski, supra,* 491 F.Supp. 432. In its comprehensive opinion, the district court relied heavily on the news clipping and affidavits that Koski had appended to her brief in the Supreme Court of New Hampshire. The district court observed that the respondent had never denied their truth nor objected to their use. It ruled that while ordinarily these papers would be outside the record, they had been "fully considered" by the state court and, given respondent's acquiescence in their use up to the present, should now be treated as part of the state record for *habeas* review. Respondent does not now appeal from that ruling.

The district court went on to find that the prosecutor's conduct had been so "vindictive" as to constitute a violation of con-

---

**4.** The two remaining affidavits were from another of the demonstrators who was pursuing a *de novo* trial and from an attorney who sat with Koski and advised her during her trial. Both recount instances in the early spring of 1979, prior to Koski's trial, where demonstrators pursuing *de novo* trials were urged to remand, it being stated by the same prosecutor who handled Koski's trial that the issues had already been decided adversely to four demonstrators by juries, that there had been "certain findings" in the state supreme court, and that

six months' sentences were being recommended. The affiants said that a number of people withdrew *de novo* appeals from fear of receiving higher sentences, and a judge was quoted as telling a demonstrator it was "ridiculous" to pursue an appeal when it appeared she would not have to serve any time were her case remanded.

**5.** Service of her sentence was deferred pending federal *habeas* review.

stitutional due process standards. It rejected the state's argument that due process is not violated by a prosecutor's threats of higher sentences upon appeal, in that the prosecutor has no control over sentencing, sentencing being rather a matter within the sole authority of the judge. While the district court recognized that the "prosecutorial vindictiveness" held in *Blackledge v. Perry* to have violated due process involved the bringing of a new charge, a matter within the *prosecutor's* power, the court concluded, nonetheless, that *Pearce, Blackledge* and *Lovett* reflected "a prophylactic rule directed against" *apprehension* on a defendant's part of receiving a vindictively imposed penalty for the assertion of rights. The question, as the court saw it, was not whether the prosecutor actually had power to carry out his threats of imposing harsher sentences upon appeal, but whether Koski reasonably feared that he did.

"Here the limits of due process dictate that the prosecutor . . . not be allowed to create in an unknowing defendant's mind the impression that the prosecutor himself can insure imposition of a higher sentence upon appeal and thus place a defendant in fear of that consequence should she exercise a right vested in her by the State itself."

491 F.Supp. at 441. The court distinguished *Colten v. Kentucky* (holding that requirements imposed in *North Carolina v. Pearce* were inapplicable to two-tier procedure) on the ground that it related only to vindictiveness of the trial judge, not that of a prosecutor. Relief was held to require not mere retrial or resentencing but complete release from custody.

## II.

◼ We go first to the propriety of considering the affidavits and clipping attached to Koski's brief in the Supreme Court of New Hampshire as part of the state record under *habeas* review. As the district court indicated, it is clear that under New Hampshire practice such materials would ordinarily form no part of the record before the Supreme Court of New Hampshire. However, there was no objection

made below nor has the New Hampshire Attorney General contested in his brief or oral argument before us the district court's reliance upon these documents. The question is thus whether any error involved in relying on these documents is of the type we should note sua sponte and contrary to the apparent desires of the parties. We think not. There is a colorable claim that the Supreme Court of New Hampshire considered the documents in spite of its rules. Given this and the posture of the respondent, we have little choice but to accept the view of the district court that these materials form part of the record subject to *habeas* review.

## III.

◼ We disagree with the district court that "prosecutorial vindictiveness" constitutes a basis sufficient in these circumstances for *habeas* relief. We are aware of no authority for the proposition that a prosecutor's mere insistence in a *de novo* proceeding that he will recommend a sentence higher than that previously *given below on the identical charge* —which threat does not deter the defendant from in fact proceeding with her appeal—is grounds for *habeas* relief.

We begin with a brief review of the controlling authorities. In *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the Supreme Court, while upholding the power of a court *on retrial* "to impose whatever sentence may be legally authorized, whether or not it is greater," *id.* at 720, 89 S.Ct. at 2078, held that "vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial," *id.* at 725, 89 S.Ct. at 2080. To guard both against vindictiveness and the fear of vindictiveness which might serve to deter a defendant's exercise of the right to appeal, the Court in *Pearce* required judges imposing a more severe sentence after a new trial to state the reasons for so doing. *Id.* at 726, 89 S.Ct. at 2081. *Pearce*, it is clear, deals solely with judicial vindictiveness—the de-

fendant's right to be freed from fear of retaliatory motivation on the part of the *sentencing judge*, and the need for the state to fully justify any increased sentence.

*Pearce* grew out of a new trial that resulted when an earlier conviction in the same court was overturned following a successful appeal. It was not until *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), that the Court dealt with a higher sentence imposed after a *de novo* trial in a state having a two-tier system similar to New Hampshire's. The Court held that the prophylactic rule laid down in *Pearce* (requiring a court to state its reasons for a higher sentence) did not apply in such a situation. The Court felt that because a brand new sentencing tribunal was involved, there was little hazard of being penalized for having sought and obtained a second trial. Nor would defendants be deterred from seeking a second trial out of fear of judicial vindictiveness, as the "possibility of vindictiveness, found to exist in *Pearce*, is not inherent in the Kentucky two-tier system." 407 U.S. at 116, 92 S.Ct. at 1960.

It is of interest that one reason given by the *Colten* court for not imposing "the restraints called for in *North Carolina v. Pearce*" on the Kentucky two-tier system, was its fear that "such restraints might, to the detriment of both defendant and State, diminish the likelihood that inferior courts would impose lenient sentences whose effect would be to limit the discretion of a superior court judge or jury if the defendant is retried and found guilty." 407 U.S. at 119, 92 S.Ct. at 1961. The *Colten* Court, in other words, foresaw a disparity between first and second tier sentences—something different from what one would ordinarily expect in retrials before the same court.

The year following *Colten*, the Supreme Court ruled that the *Pearce* restraints likewise did not apply when sentencing, upon a new trial, was to be done by the jury itself rather than the judge. *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973). The Court felt that jurors would know nothing about the previ-ous trial, would have no personal stake in the prior conviction and sentence, and would not be "sensitive to the institutional interests that might occasion higher sentences by a judge desirous of discouraging what he regards as meritless appeals." 412 U.S. at 26–27, 93 S.Ct. at 1982–1983. Language in footnote 13 in *Chaffin* is of interest here:

"It has been suggested that higher sentences on retrial might result from vindictiveness on the part of the prosecutor. As punishment for a successful appeal, for instance, a prosecutor might recommend to the jury, and strenuously argue in favor of, a higher sentence than he previously sought. No such indication exists on this record since the prosecutor vigorously urged the imposition of the death penalty at the first trial. In any event, it would be erroneous to infer a vindictive motive merely from the severity of the sentence recommended by the prosecutor. Prosecutors often request more than they can reasonably expect to get, knowing that the jury will customarily arrive at some compromise sentence. The prosecutor's strategy also might well vary from case to case depending on such factors as his assessment of the jury's reaction to the proof and to the testimony of witnesses for and against the State." 412 U.S. at 27 n.13, 93 S.Ct. at 1983 n.13.

In 1974, the Supreme Court, in *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628, confronted "prosecutorial vindictiveness" in the context of a two-tier system. Having committed an assault in prison, Perry was charged with, and convicted of, a misdemeanor in the state district court, and given a six-month sentence. When he filed the necessary papers to exercise his right to a *de novo* jury trial in the superior court, the prosecutor obtained an indictment charging him with a felony for the same assault. Perry was thereafter sentenced to a term of five to seven years.

The Supreme Court held that due process was violated, although "here the central figure is not the judge or jury, but the prosecutor." 417 U.S. at 27, 94 S.Ct. at

2102. The Court reasoned that following a conviction at the lower level a prosecutor had a considerable stake in discouraging a de novo trial.

"And, if the prosecutor has the means readily at hand to discourage such appeals—by 'upping the ante' through a felony indictment whenever a convicted misdemeanant pursues his statutory appellate remedy—the State can insure that only the most hardy defendants will brave the hazards of a de novo trial."

417 U.S. at 27–28, 94 S.Ct. at 2102. The Court concluded—quite apart from any question as to the prosecutor's actual good or bad faith—that to remove a defendant's fear of retaliatory motivation and so avoid deterring the exercise of his right to appeal, due process prohibited the State from substituting a more serious charge for the original one.

"We hold, therefore, that it was not constitutionally permissible for the State to respond to Perry's invocation of his statutory right to appeal by bringing a more serious charge against him prior to the trial de novo."

417 U.S. at 28–29, 94 S.Ct. at 2102–2103 (footnote omitted).

The Court's most recent word came in Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). There it was held that a plea-bargaining prosecutor did not violate due process by threatening a defendant with the bringing of a further charge (under a recidivist statute) if he did not plead guilty.

This Circuit's sole foray into this confused area was in the case of Lovett v. Butterworth, 610 F.2d 1002 (1st Cir. 1979), cert. denied, 447 U.S. 935, 100 S.Ct. 3038, 65 L.Ed.2d 1130 (1980). In an opinion by Judge Bonsal of the Southern District of New York, the panel held that the prosecutor violated due process by filing a new indictment at the de novo stage that had the effect, as in Blackledge, of greatly increasing the potential (and actual) sentence.

None of the foregoing authorities go so far as to suggest that by merely recommending a higher sentence on the same charge, or by threatening so to recommend, a prosecutor in a two-tier system brings about a violation of due process; and such would indeed be a drastic rule, with grave portents for our criminal justice system. Prosecutorial vindictiveness has only been found to violate due process where, as the Blackledge Court put it, "the central figure is not the judge or jury, but the prosecutor." 417 U.S. at 27, 94 S.Ct. at 2102. The improper action taken or threatened has consistently involved the power to indict, a matter which the prosecutor, not the court, controls. In Miracle v. Estelle, 592 F.2d 1269 (5th Cir. 1979), which this court drew on in Lovett, supra, the Fifth Circuit stated, "[T]he major evil with which Blackledge is concerned, is a vindictive prosecution and trial of an accused on more severe or numerous charges after the defendant has exercised a constitutional or statutory right." 592 F.2d at 1274–75 (emphasis supplied). See also United States v. Burt, 619 F.2d 831, 836 (9th Cir. 1980); United States v. Rosales-Lopez, 617 F.2d 1349, 1357 (9th Cir. 1980). This interpretation would seem to be confirmed by our inability to find any case in which the issue of prosecutorial vindictiveness did not involve an allegedly improper indictment or in which the court indicated that the rationale of Blackledge might reach beyond the problem of indicting a defendant on more serious or additional charges after his exercise of a right. See, e. g., United States v. Goodwin, 637 F.2d 250 (4th Cir. 1981); United States v. Andrews, 633 F.2d 449 (6th Cir. 1980) (en banc); United States v. Griffin, 617 F.2d 1342 (9th Cir.), cert. denied, —— U.S. ——, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980); United States v. Thomas, 617 F.2d 436 (5th Cir.), cert. denied, —— U.S. ——, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980); Lovett v. Butterworth, supra, 610 F.2d 1002; Miracle v. Estelle, supra, 592 F.2d 1269; Jackson v. Walker, 585 F.2d 139 (5th Cir. 1978); United States v. Thurnhuber, 572 F.2d 1307 (9th Cir. 1977); United States v. Stacey, 571 F.2d 440 (8th Cir. 1978); United States v. DeMarco, 550 F.2d 1224 (9th Cir.), cert. denied, 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977).

This limited application of the potentially unlimited concept of "prosecutorial vindictiveness" manifests, we believe, a proper appreciation of the manner in which our criminal justice system operates. In the first place, sentencing, unlike bringing new charges, is the province of the judge. To overturn a conviction or vacate a sentence on the theory that it was tainted by "vindictiveness" in the prosecutor's actual or threatened recommendation is to suggest that it was the prosecutor not the judge who was running the court.[6] Secondly, our adversary system proceeds on the notion that lawyers may often take positions at extreme ends of the spectrum, leaving it to the court to find a proper accommodation in between. *Compare Andrews, supra,* 633 F.2d at 459 (Merritt, J., dissenting). As Justice Powell wrote for the Court in *Chaffin v. Stynchcombe,*

> "[I]t would be erroneous to infer a vindictive motive merely from the severity of the sentence recommended by the prosecutor. Prosecutors often request more than they can reasonably expect to get . . . ."

412 U.S. at 27 n.13, 93 S.Ct. at 1983 n.13. It is common knowledge, too, that the sentence given at the first tier of a two-tier system is often lenient. *Colten, supra,* 407 U.S. at 119, 92 S.Ct. at 1961. As a practical matter, the lower court judge must take into account that a defendant will seek a *de novo* trial if he or she perceives the initial sentence as too severe. A higher sentence after a *de novo* trial may as well reflect the leniency of the lower court as the severity of the higher court. It follows that for the prosecutor to recommend a higher sentence at the trial *de novo* does not necessarily reflect an attempt to penalize the defendant for utilizing the appellate process. The recommendation may only reflect a well-founded belief that the discount rates prevailing at the lower tier, which the state was willing to accept for economy and speed of disposition, should no longer prevail. In this respect, the operation of the two-tier system invokes some of the same practical considerations as plea-bargaining. *Bordenkircher v. Hayes, supra,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604. Finally, of course, the prosecutor here was also faced with the fact that the superior court itself had previously set a pattern for sentencing other demonstrators after *de novo* trials. *See* note 2, *supra.* The recommended sentence was precisely within the range of the sentences given in those cases where similar offenses were involved, and it could well have seemed indefensible for a prosecutor to recommend a much lower sentence after the court had established a pattern.

The district court felt that *North Carolina v. Pearce* and *Blackledge v. Perry* stand for the sweeping proposition that defendants may never be put in reasonable fear that if they appeal they will be given a higher punishment. To some degree these cases do reflect that proposition—but only to some degree. The Supreme Court has recognized that there needs to be a realistic balance struck between allaying a defendant's fears and permitting a state's criminal justice system to work. Thus in *Colten* and *Chaffin* the Court was reluctant to extend the *Pearce* requirements either to trials *de novo* or trials where sentencing was by a jury. The Court's refusal so to extend *Pearce* did not stem from any illusion that there could never be a chilling effect in other situations from the possibility of a higher sentence the second time around. So long as higher sentences may be imposed, apprehension will exist: a defendant who gets a low sentence in a state district court knows he may receive a higher one if he insists on a *de novo* trial. Similarly a second trial with a jury sentencing proce-

---

**6.** We note that at the trials of anti-nuclear protestors held in the fall of 1977, the prosecutor recommended that at most 15 days be served, yet the superior court imposed sentences requiring two to four months to be served. Note 2, *supra.* In the present case, the court ordered that Koski serve two rather than the recommended three months. There is nothing to support an assumption that in New Hampshire the prosecutor's recommendation is in any way determinative of the sentence awarded, nor did the district court in this case so find.

dure may lead to a more severe sentence. Even in a *Pearce* situation, a higher sentence may be imposed on retrial if it can be properly justified. For the Court to have ended all apprehension would have required a rule disallowing any increase in sentence at all. It did not follow this path, but rather undertook to strike a practical balance between actions deemed to chill appeals excessively and those that do not. *Compare Goodwin, supra,* 637 F.2d at 254.

To rule that a prosecutor's threats to recommend a higher sentence at a *de novo* proceeding are grounds to vacate the court's later sentence, would be to create a rule almost impossible to limit. Defense counsel would be encouraged to monitor every word spoken by a prosecutor, in and out of court, to find some phrase indicative of his "vindictiveness." Courts would engage in hair-splitting as to what act of prosecutorial rudeness violated due process and what did not. The invitation to after-the-fact fly-specking would be boundless; and as every claim would rise or fall on its particular facts, each claim for post-conviction relief would have to be reviewed with time-consuming care.

Such a principle might make sense if it were clear that prosecutors should never seek higher sentences, or that prosecutors' recommendations controlled the courts' sentencing decisions. But as already explained, it is common for prosecutors, as part of our adversarial system, to seek more than they can get, and it is also common, and in no way discreditable, for initial sentences in a two-tier system to be lenient. In this context, there could be no easily applied test for determining those prosecutorial utterances which are so "vindictive" as to constitute a constitutional defect. Moreover, to vacate a conviction merely because fears were engendered by prosecutorial threats of higher sentences, even though the new trial was not in fact abandoned, and even though there is no reason to believe that the court simply adopted the prosecutor's supposedly vindictive sentence recommendation, would be to provide a totally unjustifiable windfall to a petitioner who has not been injured by the actions of which she complains. Indicative of the lack of real harm is the lack of any remedy that would fit the challenged conduct. Where courts have found that an indictment or particular charge was brought vindictively, the defendant's conviction on that indictment or charge has been overturned. *See Blackledge, supra,* 417 U.S. at 31 n.8, 94 S.Ct. at 2104 n.8 (affirming overturning of conviction on vindictive felony indictment but leaving open possibility of reconviction upon appeal from original misdemeanor indictment); *Goodwin, supra,* 637 F.2d 250 (reversing conviction on improperly added federal felony charge, affirming conviction upon original state misdemeanor charge); *Andrews, supra,* 633 F.2d at 455 (where adding a charge is found to be improper, "the ordinary remedy is to bar the augmented charge"); *Lovett, supra,* 610 F.2d at 1002 (ordering that writ of *habeas corpus* issue upon finding reindictment improper). In instances of judicial vindictiveness the remedy has been similarly tailored to the wrong. *See North Carolina v. Rice,* 404 U.S. 244, 247, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (per curiam) (stating that *Pearce* "requires only resentencing; the conviction is not *ipso facto* set aside and a new trial required."); *North Carolina v. Pearce, supra,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (affirming lower court's release of two defendants upon failure of state to resentence one and because the other had been in prison longer than his original sentence required.) The prosecutor's conduct in this case fits neither mold and would justify neither remedy, for even assuming that "vindictiveness" attached to the prosecutor's recommendation, there is simply no reason to assume that it constituted the operative reason for Koski's conviction or sentence.

We accordingly reject the district court's holding that the prosecutor's mere comments—even taking them at their worst and assuming they were meant to discourage Koski and others from proceeding with the trial *de novo*—constitute a violation of

the fourteenth amendment.[7] The fact is, Koski was not discouraged, she proceeded with the trial. Moreover, Koski knew—or, had she accepted counsel would have been advised—that the prosecutor did not control the sentencing, and that his recommendation would be offset by the right of her own attorney or herself to speak in her behalf at the sentencing and ask for a reduced sentence or no sentence at all.

## IV.

■ While we find no merit in the "prosecutorial vindictiveness" approach adopted by the district court, we are more troubled by the fact that there is evidence in this record from which it can be inferred that the court itself had a possible motivation to impose a higher sentence for the specific purpose of deterring appeals. When Koski was tried in superior court in May 1979, a crisis had obviously arisen concerning the handling of the hundreds of pending *de novo* appeals of her codemonstrators. This crisis was resolved two months later in July 1979 when the Rockingham County Superior Court felt itself obliged to dismiss, on motion, all remaining cases on speedy trial grounds, stating that it simply lacked the resources to try them. *See* note 2, *supra*. While the judge in Koski's case was, to all outward appearances, entirely even-handed, it can be argued that he had to know of the court's plight, and hence was under pressure to make an example of Koski in order to discourage her colleagues.

However, while there is basis for such an inference, there were also grounds for believing that the sentencing court was prompted to impose its longer sentence by other, legitimate reasons. At the colloquy between the judge and prosecutor during sentencing, the prosecutor explained that he was recommending a six-month sentence with two months suspended, "[i]n order to be consistent with what has happened in the past, and in line with the *State v. Wentworth* case." [8] In *State v. Wentworth*, 118 N.H. 832, 395 A.2d 858 (1978), the Supreme Court of New Hampshire sustained a sentence identical to that recommended here which was imposed upon another 1977 nuclear protestor convicted of criminal trespass. Stressing the importance of general deterrence, Justice (now Chief Justice) Grimes pointed out that,

---

7. Koski was, of course, proceeding pro se at her own option, thus it was not a breach of professional ethics for the prosecutor to approach her personally. For a prosecutor to approach a counselled defendant, without her attorney present, might well give rise to different issues.

8. The colloquy at sentencing went as follows: "THE COURT: Does the State have a recommendation?
MR. McFARLANE: Yes, Your Honor.
THE COURT: All right.
MR. McFARLANE: In order to be consistent with what has happened in the past, and in line with the State v. Wentworth case, the State would recommend six months in the house of correction with two months suspended.
THE COURT: All right. Norma Koski, would you like to be heard on the sentencing?
THE DEFENDANT: I don't agree. I don't think the jury has made a proper verdict and I'd like to appeal. I'm not a criminal.
 * * * * * *
THE COURT: If you'd like to be heard on the sentence, I'd be very happy to listen.
THE DEFENDANT: Of what I think my sentence should be?
THE COURT: Yes.

THE DEFENDANT: I don't think there should be a sentence.
THE COURT: Well, what reason do you—
THE DEFENDANT: Because I'm not a criminal and I should not go to jail.
 * * * * * *
THE COURT: Well, is that it?
THE DEFENDANT: Yes.
THE COURT: All right. Mr. McFarlane, is there any credit that you know of?
MR. McFARLANE: Yes. I believe that there is 13 days that Miss Koski spent in the—in connection with the May 2nd violation.
THE COURT: Thank you.
THE CLERK: Norma Koski, you want to stand? The Court has considered the offense with which you have been charged and the jury's finding of guilty and orders that you be sentenced to six months in the Rockingham County House of Correction. Three months of this sentence is suspended. You are ordered to pay a fine of $200, plus ten percent penalty. Credit of 13 days of pre-trial confinement is noted. You are remanded to the custody of the Sheriff for the carrying out of this sentence."

"The defendant in this case is an educated, highly motivated individual with no prior record and with no apparent criminal tendencies apart from the practice of civil disobedience to accomplish what he considers to be an important goal. He is not in need of rehabilitation in the modern sense of the word. The State, however, does need to deter repetition of this offense both by the defendant and others. Both individual and general deterrence were important considerations for the imposition of sentence in this and related cases. To accomplish these purposes, the sentence needed to be more severe than in ordinary criminal trespass cases. In deciding on the degree of severity to obtain the necessary deterrent effect, the trial judge was entitled to consider the dedication and motivation of the offender who would not likely be deterred by a lighter sentence, but who with others might be induced by a more severe sentence to use lawful, instead of unlawful, means to protest."

118 N.H. 842–43, 395 A.2d at 865. While Koski was not "highly educated," she otherwise fits the description of the appellant in *Wentworth* and the same reasons for a deterrent apply to her. Her colloquy during sentencing makes clear her belief that it was she who was right, and the court and jury wrong, and that no sentence whatever—whether reduced or not—would be acceptable.[9]

In affirming Koski's conviction, the Supreme Court of New Hampshire specifically cited and reaffirmed its analysis in *State v. Wentworth* relative to punishment. In what appears to be a shorthand reference to the above-quoted rationale, it characterized Koski's sentence as designed not "to deter de novo trials, but to deter illegal actions." This court, it may be added, has itself held that general deterrence is a proper sentencing consideration. *United States v. Ward-*

*law,* 576 F.2d 932 (1st Cir. 1978); *United States v. Foss,* 501 F.2d 522 (1st Cir. 1974).

It seems clear, therefore, that in imposing and sustaining the present sentence the state courts meant to rely on the rationale articulated in *Wentworth,* as well as on the six-months pattern already well established in earlier cases dealing with Koski's fellow protestors. The Attorney General of New Hampshire has so represented in arguments to the district court and to this court. The situation is thus different altogether from that in *North Carolina v. Pearce* where the Court stated, "neither at the time the increased sentence was imposed upon Pearce, nor at any stage in this habeas corpus proceeding, has the State offered any reason or justification for that sentence beyond the naked power to impose it." 395 U.S. at 726, 89 S.Ct. at 2081.

Not only has the State articulated a constitutionally acceptable rationale, the Supreme Court of New Hampshire specifically found that in Koski's case "the sentence . . . was not imposed to deter de novo trials, but to deter illegal actions, and was fully justified in furtherance of that purpose." *Koski, supra,* 120 N.H. at 117, 411 A.2d at 1125. Under 28 U.S.C. § 2254(d), federal courts are bound in *habeas* proceedings to accept a factual determination made by a state court unless they expressly find that one of eight conditions obtains. *See* 28 U.S.C. § 2254(d); *Sumner v. Mata,* —— U.S. ——, ——, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981). None of these conditions seem to us to apply and none were mentioned by the district court. While the possibility of a "bad" reason existed for imposition of the higher sentence, we do not think a federal court should reject the state's articulated "good" reasons where the record provides ample support for them.

*Reversed.*

---

9. In the newsclipping, County Attorney Carleton Eldredge is quoted as saying, "Part of what we should be doing is discouraging this kind of law breaking. I've yet to hear anyone say, 'I repent, I'm sorry, I won't do it again.' On the contrary they arrogantly announce that they'll do the same thing again." While Koski cites the clipping as showing the prosecutor was seeking to discourage her appeal, the above quotation and others also point to the existence of perfectly legitimate reasons for recommending a high sentence.

801

COFFIN, Chief Judge, concurring.

Although I concur in the result reached by the court, I would follow a different route. Specifically, I am troubled by the possibility that Part III of court's opinion could be read as holding that a prosecutor's threat to recommend a more severe punishment after the second trial in a two tier system cannot, because of the prosecutor's secondary or advisory role in sentencing decisions, constitute a violation of due process. As is recognized in *Corbitt v. New Jersey*, 439 U.S. 212, 222, 99 S.Ct. 492, 499, 58 L.Ed.2d 466 (1978), there exists the possibility that the judge may be "substantially influenced by the prosecutor and the plea-bargaining process". While extreme cases will be rare, I can imagine a factual record revealing such complete judicial abdication to or absorption of an earlier announced sentencing threat of a prosecutor that due process should be held to have been violated.

Here, however, the threat was a factual description of the length of sentences that had already been meted out for like offenses and the prosecutor's actual recommendation was phrased in terms of consistency "with what has happened in the past". Had statements of such tenor been made within the context of a plea bargaining session, there would be little question of any due process violation. *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). The nature of the statement, the record of consistent past sentences for like offenses, and the refusal of the judge to accept precisely the recommendation all convince me that the prosecutor's statement did not transgress due process bounds.